UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAMALPAIS UNION HIGH SCHOOL DISTRICT,<br><br>        Plaintiff,<br><br>   v.<br><br>D. W.,<br><br>        Defendant. | Case No. 16-cv-04350-HSG<br><br>**ORDER DENYING CROSS-MOTIONS FOR SUMMARY JUDGMENT AND AFFIRMING ALJ'S DECISION IN ITS ENTIRETY**<br><br>Re: Dkt. Nos. 43, 44 |

Pending before the Court are Plaintiff Tamalpais Union High School District's ("Tamalpais" or "District") and Defendant minor D.W.'s cross-motions for summary judgment filed on February 6, 2017. Dkt. Nos. 43, 44.[1] Each party filed its opposition on February 23, 2017. Dkt. Nos. 45, 46. The Court held a hearing on March 30, 2017. Dkt. No. 52. The Court **DENIES** each motion, and affirms the ALJ's decision, for the reasons set forth below.

## I. BACKGROUND

Before turning to the factual and procedural background of this case, the Court sets forth the basic legal framework of the Individuals with Disabilities Education Act ("IDEA") and applicable California law.

### A. Legal Framework of IDEA and California Education Code §§ 56500, *et seq.*

#### i. Legislative Purpose of IDEA

IDEA was enacted "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed

---

[1] D.W.'s 30-page brief, filed without leave to submit an oversize brief, violates this District's local rules. Civil L.R. 7-4(b). The Court has no obligation to consider anything in the brief past page 25, and will not do so.

to meet their unique needs," 20 U.S.C. § 1400(d)(1)(A), and "to ensure that the rights of children with disabilities and parents of such children are protected," *id.* § 1400(d)(1)(B). Before the first incarnation of the statute was enacted, children with special needs were not receiving appropriate educational services, were being excluded entirely from schools, were left undiagnosed, and did not have access to sufficient resources. *Id.* § 1400(c)(2). To those ends, IDEA provides states with special-education funding that is conditional upon creating rules, regulations, and policies that conform to the purposes and requirements of the federal statute. *Id.* §§ 1407, 1411-13; *see also Honig v. Doe*, 484 U.S. 305, 310 (1988) (describing structure of the Education of the Handicapped Act, the predecessor of IDEA). In California, those rules are found in the California Education Code §§ 56500, *et seq.* and title 5 of the California Code of Regulations §§ 3000, *et seq. Porter v. Bd. of Trs. of Manhattan Beach Unified Sch. Dist.*, 307 F.3d 1064, 1066-67 (9th Cir. 2002).

States receiving funding under IDEA are required to provide all disabled children with a "free appropriate public education," or FAPE. *See* 20 U.S.C. § 1411(d). In large part, this means that every disabled child must receive an appropriate "special education" along with "related services" "at public expense." *Id.* § 1401(9). Under IDEA, a "special education" means a "specially designed instruction" that "meet[s] the unique needs of a child with a disability." *Id.* § 1401(29). "Related services" means transportation to and from school and supportive services like speech-language pathology and social work services. *Id.* § 1401(26)(A). IDEA requires that the student's "educational program . . . be appropriately ambitious in light of his circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001 (2017); *see also id.* (holding that IDEA "requires an educational program reasonably calculated to enable a child to make progress in appropriate light of the child's circumstances").

### ii. Individualized Evaluation and Educational Programming

To ensure a FAPE, IDEA requires that the local educational agency "conduct a full and individual initial evaluation" of a student "before the initial provision of special education and related services." 20 U.S.C. § 1414(a)(1). This evaluation "determine[s] whether a child is a child with a disability" within the meaning of IDEA, as well as "the educational needs of such child."

*Id.* § 1414(a)(1)(C)(i), (ii).  To do so, the local educational agency must (A) "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent"; (B) "not use any single measure or assessment as the sole criterion"; and (C) "use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors." *Id.* § 1414(b)(2).  The local educational agency must also ensure, among other things, that the child is assessed in all areas of suspected disability.  *Id.* § 1414(b)(3)(B).  After these assessments are completed, a team of qualified professionals must determine whether the child has a cognizable disability and, if so, the educational needs of the child.  *Id.* § 1414(b)(4).

Once an initial evaluation report is issued, the professionals who assessed the student, in connection with other qualified professionals and the student's parents, prepare an individualized educational program ("IEP") for the student.  *Id.* § 1414(c), (d).  The IEP is a written statement that includes: (1) the child's present levels of academic achievement and functional performance; (2) a statement of measurable annual goals; (3) a description of how the child's progress will be measured; (4) a statement of the special education and related services to be provided to the child; (5) an explanation of the extent to which the child will not participate with nondisabled children; (6) necessary testing accommodations; (7) the start date for the IEP; and (8) postsecondary school goals and transition plans for further education or employment.  *Id.* § 1414(d).  The team that created the IEP then reviews it periodically and revises it as appropriate.  *Id.* § 1414(d)(4).

### iii.    Complaint and Due Process Hearing

"When a party objects to the adequacy of the education provided, the construction of the IEP, or some related matter, IDEA provides procedural recourse: It requires that a State provide '[a]n opportunity for any party to present a complaint . . . with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child.'" *Winkelman ex. rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 525 (2007) (quoting 20 U.S.C. § 1415(b)(6)).  By presenting a complaint, a party is able to pursue a process of review that begins with an informal preliminary meeting.  20 U.S.C. § 1415(f)(1)(B)(i)(IV).  If the complaint is not resolved "to the satisfaction of the parents

3

within 30 days," *id.* § 1415(f)(1)(B)(ii), they may request an "impartial due process hearing" to be conducted either by the school district or by the state educational agency, *id.* § 1415(f)(1)(A).

During a due process hearing, the hearing officer will decide whether the school district committed a substantive or procedural violation. *Id.* § 1415(f)(3)(E).[2] A substantive violation lies if a child was denied a FAPE. *Id.* § 1415(f)(3)(E)(i). "In matters alleging a procedural violation," the hearing officer "may find that a child did not receive a free appropriate public education" only if the procedural violation "(I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits." *Id.* § 1415(f)(3)(E)(ii). And IDEA allows a hearing officer (or court) to require the school district "to reimburse the parents for the cost of [private-school] enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child." *Id.* § 1412(a)(10)(C)(ii).

If the school district, rather than the state educational agency, conducts the due process hearing, then "any party aggrieved by the findings and decision rendered in such a hearing may appeal such findings and decision to the State educational agency." *Id.* § 1415(g)(1). Once the state agency has reached its decision, an aggrieved party may file suit in federal court: "[a]ny party aggrieved by the findings and decision made [by the hearing officer] shall have the right to bring a civil action with respect to the complaint." *Id.* § 1415(i)(2)(A); *see also* § 1415(i)(1) (providing general overview of IDEA's procedural safeguards).

### B. Administrative Law Judge's Findings

The Court now turns to the findings of fact made by Administrative Law Judge ("ALJ") Lisa Lunsford in the underlying administrative proceeding. Dkt. No. 50 (administrative record) ("AR").[3]

D.W. is a 16-year old male who resides in Tamalpais's school district with his parents

---

[2] The state laws enacted in compliance with IDEA, rather than IDEA itself, set forth the rules of decision in a due process hearing. *See Porter*, 307 F.3d at 1068-69.

[3] For consistency, the Court refers to the AR by its original Bates number pagination, in the lower right hand corner on each page of the record.

("Parents"). AR 000529 ¶ 1.  When D.W. was three years old, he was found eligible to receive and began receiving special education under the speech or language impairment category.  *Id.* ¶ 2.  In the fifth grade, he was diagnosed with attention deficit hyperactivity disorder and was found eligible for special education on that basis as well.  *Id.*  Before high school, D.W. had never attended a public school and had been enrolled at a private school for students with mild to moderate learning differences and social communication disorders.  *Id.* ¶ 3.

D.W. transferred into Tamalpais's school district to begin high school in the fall of 2014.  *Id.* ¶ 4.  To prepare for the transition, in April 2014, Tamalpais proposed to assess D.W. in the areas of academic achievement, cognitive development/learning ability, and speech and language in order to develop an IEP for him.  *Id.*  His mother consented.  *Id.*  D.W.'s speech-language assessment, conducted by a speech-language pathologist, showed that he exhibited special needs in language comprehension and social pragmatics.  AR 000530 ¶ 5.  As a result, D.W. needed frequent check-ins from his teachers as well as targeted language therapy.  *Id.*  His academic and psychoeducational assessment, conducted by a school psychologist in June 2014, showed average or above-average performance in most academic areas and average cognitive abilities, but also reflected that D.W. struggled with defiance/aggression, hyperactivity, learning, executive function, inattention, and social relations.  AR 000530-31 ¶¶ 6-11.  This confirmed D.W.'s need for multiple classroom accommodations and potentially coaching and support around emotional and behavioral management.  AR 000531 ¶ 12.  In sum, D.W. remained eligible for special education.  *Id.*

Following these assessments, in June 2014, Tamalpais convened an IEP team meeting with Parents.  *Id.* ¶ 13.  Under the proposed IEP, Tamalpais offered to place D.W. in a general education program at a public high school within the district, but with resource specialist support for one period each day, individual and group speech and language therapy for 45 minutes each week, and various classroom and out-of-classroom accommodations.  AR 000532 ¶ 14.

After D.W.'s mother visited and observed a social skills class, Parents decided to place D.W. in a new private high school, Sterne School, and requested reimbursement on the basis that the proposed IEP did not provide a FAPE, as required by IDEA and the California Education

Code. AR 000534 ¶ 20. On August 11, 2014, Tamalpais denied the funding request. *Id.* D.W. attended the new school for the fall of 2014, but ultimately transferred back to his previous private school, Stanbridge Academy, for the remainder of the school year. *Id.* ¶ 21. Parents notified Tamalpais about this new placement and again requested reimbursement, and Tamalpais again denied the request. *Id.*

On March 13, 2015, in anticipation of the annual IEP meeting, Tamalpais requested that Parents allow it to reassess D.W.'s needs. *Id.* ¶ 22. His father consented. *Id.* The assessment was completed on May 21, 2015, and it concluded that D.W. had made progress on the academic and psychoeducational goals set during his previous assessment, but his maladaptive behaviors had not disappeared. AR 000534-35 ¶¶ 23-25. D.W. had also made progress on his speech and language goals, but continued to struggle with social pragmatics. AR 000535 ¶ 26. Following these assessments, on May 21, 2015, Tamalpais convened an IEP team. *Id.* ¶ 27. The 2015-16 IEP set the same goals as the 2014-15 IEP, but added several new goals for transitioning and social pragmatics. AR 000537 ¶ 35. D.W.'s special accommodations remained largely the same. *Id.* Based on these findings, the 2015-16 IEP offered to place D.W. in a public high school with special education day classes for certain subjects, general education classes for others, and individual and group speech and language services. *Id.* ¶¶ 36-37.

After the IEP meeting, D.W.'s mother again visited and observed the special day class that the IEP offered. AR 000540 ¶ 49. On June 17, 2015, Parents refused the 2015 IEP offer and requested funding to place D.W. back at Stanbridge. *Id.* Tamalpais denied the request. *Id.*

## C. Administrative Proceedings

On April 18, 2016, Parents initiated a due process hearing before the California Office of Administrative Hearings ("COAH") alleging that Tamalpais had denied D.W. a FAPE for the 2014-15 and 2015-16 school years, in violation of IDEA and the California Education Code. AR 000002-03. Specifically, with respect to both the 2014-15 and 2015-16 school years, Parents alleged that Tamalpais had failed to offer D.W. classes with a small enough student-to-teacher ratio and failed to offer any counseling services. AR 000002-03; AR 000027. With respect to the 2015-16 school year, Parents also alleged that Tamalpais had failed to offer mental health and

sensory integration evaluations before creating the 2015 IEP, AR 000003-04, that Tamalpais's speech and language therapy offer was unclear as to whether and how often services would be provided in a group versus individual setting, AR 000003, and that Tamalpais did not offer sufficient speech and language services regardless, AR 000027.

On July 8, 2016, after a three-day evidentiary hearing, the ALJ found that Tamalpais did not deny D.W. a FAPE for 2014-15 or 2015-16 by failing to offer sufficient special education services.[4] *See* AR 000543 ¶¶ 6-9 (District's decision not to offer a student-to-teacher ratio of "not more than" one teacher per eight students did not deny a FAPE); AR 000544 ¶¶ 10-12 (District's decision not to offer D.W. counseling as a related service did not deny a FAPE). But the ALJ found that Tamalpais denied D.W. a FAPE for the 2015-16 school year by failing to provide a mental health assessment, AR 000546 ¶¶ 19-20, and a sufficiently clear IEP offer for speech and language therapy, AR 000549-50 ¶¶ 32-33. As a remedy, the ALJ ordered Tamalpais to reimburse Parents for D.W.'s 2015-16 private school tuition and transportation costs, AR 000554 ¶¶ 11-12, as well as pay for an independent mental health evaluation, AR 000552 ¶ 5.

## II.    LEGAL STANDARD

"Judicial review in IDEA cases differs substantially from judicial review of other agency actions, in which courts are generally confined to the administrative record and are held to a highly deferential standard of review." *M.C. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1194 (9th Cir. 2017) (quoting *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471 (9th Cir. 1993)) (internal quotation marks omitted) ("*Antelope Valley*"). Instead, courts "review whether a state has provided a FAPE de novo." *Id.* (citing *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994)). A reviewing court may "accord some deference to the ALJ's factual findings, but only where they are thorough and careful." *Id.* (citing *Union Sch. Dist.*, 15 F.3d at 1524). To determine whether an ALJ has been sufficiently "thorough and careful," it is not enough to focus on the "duration of the hearing, nor the ALJ's active involvement, nor the length of the ALJ's opinion." *Id.* Rather, a district court judge "must actually examine the record to determine

---

[4] The ALJ did not reach the question of whether Tamalpais's IEP for speech and language therapy was sufficient because she found an *a priori* procedural violation. AR 000551 ¶ 36.

whether it supports the ALJ's opinion." *Id.* at 1194 n.1.

III.    **ANALYSIS**

    **A.    Tamalpais's Motion For Summary Judgment**

        Tamalpais moves for summary judgment on three grounds.  First, Tamalpais contends that the ALJ erred in finding that the school district denied D.W. a FAPE by failing to conduct a mental health assessment prior to the 2015-16 school year.  Second, Tamalpais argues that the ALJ erred in finding that its offer of speech and language services for the 2015-16 school year was insufficiently clear, and thus constituted a denial of a FAPE to D.W.  Third, Tamalpais argues that even if the ALJ correctly found this failure to be a denial of a FAPE, the remedy awarded—full reimbursement of D.W.'s tuition for the 2015-16 school year—was unwarranted under IDEA. The Court disagrees as to each of these contentions, affirms the ALJ's findings and conclusions, and denies Tamalpais's motion.

        **i.    The ALJ Correctly Found that Tamalpais Denied D.W. a FAPE by Failing to Conduct a Mental Health Assessment for 2015-16**

        The ALJ concluded that Tamalpais committed a procedural violation of IDEA because it failed to assess D.W. for mental health issues during his 2015 evaluation, despite being placed on notice of a potential disability by his 2014 evaluation.  AR 000546 ¶ 19-20.  Specifically, the ALJ found that Tamalpais was put on notice in 2014 that D.W. had symptoms of anxiety and aggression that could be rooted in a social-emotional or mental health condition.  AR 000545 ¶ 16. The ALJ further concluded that this procedural violation constituted a denial of a FAPE for 2015-16 because it "significantly impeded Parents' opportunity to participate in the decisionmaking process regarding the provision of a FAPE to [D.W.]" by making it "impossible for Parents to know whether Tamalpais's May 2015 IEP offer recommended the appropriate goals, accommodations and services to address [D.W.'s] unique needs . . . ."  AR 000546 ¶ 20.

        A school district has a duty during an individual evaluation to assess a student in "all areas of suspected disability."  *Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1119 (9th Cir. 2016) (quoting 20 U.S.C. §§ 1414(a)(1)(A), (b)(3)(B)).  California Education Code § 56320(f) also requires that the child be assessed "in all areas related to the suspected disability."  A

disability is "suspected" when "the district has notice that the child has displayed symptoms of that disability." *Timothy O.*, 822 F.3d at 1119. "A school district cannot disregard a non-frivolous suspicion of which it becomes aware simply because of the subjective views of its staff, nor can it dispel this suspicion through informal observation." *Id.* at 1121. That said, a procedural violation of IDEA is not actionable unless it constitutes a denial of a FAPE. 20 U.S.C. § 1415(f)(3)(E)(ii). That occurs only if the procedural violation: "(I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits." *Id.*

The Court finds that the ALJ did not err in relying on *Timothy O.* and finding that Tamalpais had a duty to evaluate D.W. for mental health-related disabilities during his 2015 evaluation. The ALJ found that D.W. did not establish that Tamalpais should have offered counseling as a related service in his 2014 IEP, AR 000533-34 ¶ 19, because D.W. did not meet his burden of showing that his "negative peer interactions," "aggressive behaviors," and "severe episode of hair pulling" "were rooted in a social-emotional need requiring counseling." AR 000532 ¶ 16. That same evidence, however, put Tamalpais on notice that it should have at least conducted a mental health evaluation the following year. *See, e.g.*, AR 000262 (teacher's report that "[s]everal times this year, we have had to evacuate the classroom in order for a counselor to take over with [D.W.'s] outbursts"); AR 000263 (teacher's report that D.W. "developed the bad habit of pulling his hair out," resulting in "a circular bald spot that had a diameter of two inches"); AR 000266 (teachers' reports that D.W. exhibited "elevated scores" in Defiance/Aggression); *id.* ("[D.W.] rated himself in the Average range in all areas of functioning, with the exception of Aggression where he rated himself in the At-Risk range."); *id.* (rating by D.W.'s mother that described his Defiance/Aggression as "Clinically Significant"); AR 000375 (teacher's statement at 2015 IEP meeting that "if [D.W.] were to move to a larger campus . . . he would need support and counselors to access if he got upset"). Tamalpais was thus "on notice that [D.W.'s] mental health [was] an area of suspected disability." *See* AR 000536 ¶ 33. Moreover, as the ALJ noted in her decision:

> This conclusion does not conflict with the earlier determination that [D.W.] did not establish a need for counseling as a related service. The two conclusions are based on different legal standards, and while the evidence showed that mental health was an area of suspected disability, [D.W.] did not establish that he required counseling as a related service in his June 2014 IEP in order to receive educational benefit.

AR 000546 ¶ 21.

The Court is not persuaded by Tamalpais's argument that "[b]y reaching back to information regarding D.W.'s behavior provided to the District prior to the June 6, 2014 IEP and by ignoring significant evidence of a change in that behavior through, at least, May 21, 2015, OAH violated the 'snapshot rule' in determining whether the District was required to provide D.W. with a 'mental health' assessment in the period between May 21, 2015 and May 17, 2016." Dkt. No. 44 at 26. This argument fails for two reasons.

First, Tamalpais is incorrect that the "snapshot rule" precluded the ALJ from considering evidence of D.W.'s past behavior in evaluating the 2015-16 offer. The point of the "snapshot rule" is to ensure that a district's actions are evaluated based on information available to it at the time of the relevant decision, rather than being judged in hindsight based on information that only became available later. *See J.G. v. Douglas Cnty. Sch. Dist.*, 552 F.3d 786, 801 (9th Cir. 2008) (holding that courts "consider the IEP at the time of its implementation, not in hindsight"); *L.J. v. Pittsburg Unified Sch. Dist.*, 850 F.3d 996, 1004 (9th Cir. 2017)("We employ what is termed the 'snapshot' rule that instructs the court to judge the appropriateness of the determination on the basis of the information reasonably available to the parties at the time of the IEP meeting."). Here, there was no application of hindsight: the ALJ correctly found that information about D.W.'s behavior leading up to 2014 was appropriately part of the "snapshot" Tamalpais was required to consider in May 2015 as part of the process of preparing its 2015-16 IEP offer.

Second, the Court disagrees that the ALJ "ignored" evidence of a subsequent change in D.W.'s behavior. The ALJ received substantial testimony and considered a number of exhibits bearing on this point, and made well-supported findings as to why the reported behaviors triggered Tamalpais's duty to assess D.W.'s mental health as of May 2015. AR 000535-36; AR 000545-46. The ALJ considered this evidence in a thorough and careful manner, and weighed the relative

persuasiveness of the parties' contentions.  AR 000545-46.  The Court accordingly affords the

ALJ's factual findings appropriate deference, *Antelope Valley*, 858 F.3d at 1194, and agrees with

those findings and the ALJ's ultimate conclusion based on them.

Finally, the Court finds that the ALJ did not err in finding that this procedural violation

constituted a denial of a FAPE to D.W.  The Ninth Circuit made clear in *Timothy O.* that the

failure to assess a student for a suspected disability is a "fundamental procedural violation[]" that

makes it "impossible for the IEP Team to consider and recommend appropriate services necessary

to address [a student's] unique needs."  822 F.3d at 1119.

> ### ii. The ALJ Correctly Found that the Lack of Clarity of the May 2015 IEP Offer Constituted a Procedural Violation of IDEA, and Appropriately Awarded Reimbursement of Costs for the 2015-16 School Year as a Remedy for this Denial of a FAPE

The ALJ concluded that Tamalpais's 2015 IEP offer was so unclear as to the provision of

individual and group speech and language therapy that it denied D.W. a FAPE.  AR 000549-50 ¶¶

32-33.  Specifically, the ALJ found that:

> On the IEP, the boxes are checked for both individual and group
> services and there is no further information to describe how the 45
> minutes per week would be allotted to each.  The IEP's only
> description of the services is a "combination of individual and
> group." Such language is too vague to permit Parents to understand
> the nature, frequency and duration of the services. Although
> Tamalpais explained to Parents that the offer included a weekly 45
> minute pragmatic social skills group, the IEP does not reflect that
> the 45 minutes per week is spent solely in a group, nor does it
> reference or describe the specific group.

*Id.* ¶ 32.  The ALJ concluded that this procedural violation constituted a denial of a FAPE because

it "significantly impeded Parents' opportunity to participate in the IEP process." *Id.* ¶ 33.

Specifically, the ALJ found that:

> The offer left it to [the therapist's] discretion as to whether and how
> to apportion [D.W.'s] speech and language services between group
> and individual therapy, yet there was no agreement, nor could there
> be a guarantee, that she would be [D.W.'s] service provider
> throughout the year.  Understanding the offer and implementation of
> the services could therefore change with each service provider,
> ranging from up to 45 minutes per week of individual services to
> none at all.

1   *Id.* ¶ 35.  Based on these findings, the ALJ awarded Parents complete reimbursement of the private

2   school tuition they paid in 2015-16, as well as transportation costs.  AR 000554 ¶¶ 10-12.

3          The Court finds that the ALJ's decision and the remedy it imposed were correct.  The

4   Ninth Circuit has made clear that a written IEP is a "formal requirement [that] has an important

5   purpose that is not merely technical [and] should be enforced rigorously . . . [because] a formal,

6   written offer creates a clear record that will do much to eliminate troublesome factual disputes

7   many years later about when placements were offered, what placements were offered, and what

8   additional educational assistance was offered to supplement a placement, if any."  *Union Sch.*

9   *Dist.*, 15 F.3d at 1526 (holding that a district's failure to provide any written IEP was a procedural

10  violation of IDEA).  IDEA requires an IEP to include a statement of the special education and

11  related services that will be provided to the student.  20 U.S.C. § 1414(d)(1)(A)(i)(IV); *accord*

12  Cal. Educ. Code § 56345(a)(4).  IDEA also requires that the IEP set forth "the anticipated

13  frequency, location, and duration of those services and modifications."  20 U.S.C. §

14  1414(d)(1)(A)(VII); *accord* Cal. Educ. Code § 56345(a)(7).

15         Recently, in *Antelope Valley*, the Ninth Circuit emphasized that an IEP "provides notice to

16  both parties as to what services will be provided to the student during the period covered by the

17  IEP."  858 F.3d at 1197.  It also serves the "function of . . . measuring the student's progress

18  toward the goals outlined in the IEP."  *Id.*  "[P]arents must be able to participate in both the

19  formulation and the enforcement of the IEP," and insufficiently specific drafting "render[s] the

20  IEP useless as a blueprint for enforcement."  *Id.* at 1199; *see also R.E.B. v. Haw. Dep't of Educ.*,

21  2017 WL 4018395 at *2-3 (9th Cir. Sept. 13, 2017) (finding denial of FAPE where language in

22  IEP was "too vague to enable [student] to use the IEP as a blueprint for enforcement").

23         The ALJ correctly found that the IEP "did not clearly identify the nature of the speech and

24  language services that Tamalpais intended to provide to Student."  AR 000549 ¶ 32.  The form had

25  the boxes for both "group" and "individual" services checked, and the narrative description said

26  only "45 min served Weekly."  AR 000365.  While the meeting notes from the IEP meeting

27  described the services as a "combination of individual and group," AR 000375, the ALJ correctly

28  found that the IEP neither reflected that the 45 minutes per week was to be spent solely in a group,

nor referenced or described the specific group, AR 000549 ¶ 32. And while Alysoun Quinby, Tamalpais's speech-language pathologist, testified that she explained in the IEP meeting that "the 45 minutes per week was a group with occasional individual services as needed," AR 001058, the IEP did not commit to this or any other particular means for providing the services. For these reasons, the ALJ was correct to conclude that "the May 2015 offer was too vague to permit Parents to make an intelligent decision about whether to accept the offer." AR 000549 ¶ 32. Because the IEP did not sufficiently give notice of the specific services Tamalpais was committing to provide, it was "useless as a blueprint for enforcement," *see Antelope Valley*, 858 F.3d at 1199, and Tamalpais's procedural violation of IDEA constituted a denial of a FAPE.

Tamalpais makes three primary arguments in response, none of which the Court finds persuasive. First, Tamalpais argues that "there is no dispute that Parents understood the District's speech and language offer to be for the District's pragmatic social skills group, and . . . there is no dispute that the nature of the group provides for both group and as-needed speech and language services . . . ." Dkt. No. 44 at 15. However, as the ALJ noted, the record does not establish, and it is thus not undisputed, that Parents clearly understood the nature of the services being offered. AR 000550 ¶ 34 ("[T]he evidence does not establish that parents clearly understood [the IEP]."); *see also* AR 000645-46 (D.W.'s father testified, with regard to the "individual" and "group" boxes checked on page 140 of the IEP, that "it clearly wasn't clear to us as to what that actually meant, and that was part of the reason we didn't accept the offer").

More substantially, Tamalpais argues that the ALJ erred in interpreting *Union School District* to compel the conclusion that the description of the speech and language services in the IEP was inadequately specific and constituted a procedural violation of IDEA. Tamalpais contends that "*Union* has not been extended to require exacting specificity in all aspects of an IEP offer[,] even when the offer provides some uncertainty." Dkt. No. 44 at 18. Tamalpais further contends, citing *J.L. v. Mercer Island School District*, 592 F.3d 938, 953 (9th Cir. 2010) ("*Mercer Island*"), that "when services, like here, are to be provided on an 'as-needed' basis, it is 'not reasonable to expect the school district to predict the amount of time' the student will access the service." *Id.*

The Court agrees in substantial part with Tamalpais's reading of *Mercer Island*, but cannot accept the District's broader premise given the Ninth Circuit's recent clear direction in *Antelope Valley*. The ALJ found that speech-language pathologist Quinby's "explanation that individual services would be offered 'as needed,' even if it had been understood by Parents and part of the written order, does not satisfy *Union* or the requirement to identify the frequency and duration of related services." AR 000550 ¶ 32. The Court does not read *Union School District* to reach as far as the ALJ concluded where, as here, the offered services at issue are by nature responsive in part, and accordingly impossible to predict with numerical precision. *Union School District* found that the complete failure to provide any written IEP at all constitutes a denial of a FAPE. 15 F.3d at 1523, 1526. But the Court does not read that case to establish that any IEP with an "as needed" provision regarding the amount of individual therapy to be provided would necessarily constitute a procedural violation. As the Ninth Circuit explained in *Mercer Island*, "[b]ecause the individualized education program is written before the provision of any services, it is not reasonable to expect the school district to predict the amount of time the student will actually use the accommodations to which she has been given access." 592 F.3d at 953. While *Mercer Island* involved "on demand" services, that case tends to suggest that Tamalpais was not required to specify numerically how 45 minutes of therapy services would be divided between individual "as needed" therapy and group therapy services each week. *See id.* The Court agrees with Tamalpais that this aspect of the ALJ's reading of *Union School District* is likely unworkable, and "creates a near impossible standard of specificity for school districts." Dkt. No. 44 at 16.

The Court also notes that the district court decisions from this circuit upon which the ALJ relied involved provisions substantially less specific than the ones at issue in this case and in *Mercer Island. See Bend-LaPine Sch. Dist. v. K.H.*, No. Civ. 04-1468-AA, 2005 WL 1587241, at *10 (D. Or. June 2, 2005) (holding that IEP behavior plan providing that specially designed instruction would be provided "throughout the school day" was too vague and indefinite to make resource commitment clear); *Marcus I. ex rel. Karen I. v. Dep't of Educ.*, Civil No. 10-00381 SOM/BMK, 2011 WL 1833207, at *1, 7-8 (D. Haw. May 9, 2011) (holding that IEP offer for student to attend "the public high school in [student's] home community" was not specific enough

1    because that description could have applied to two different high schools).

2            Nonetheless, the Court finds that *Antelope Valley* compels affirmance of the ALJ's

3    decision for an analytically distinct reason:  even setting to the side the question of whether the

4    IEP had to include a precise numerical breakdown of individual versus group minutes to satisfy

5    IDEA's mandates, the terse description in the IEP of the services being offered was insufficiently

6    specific to provide notice as to exactly what Tamalpais was committing to do.  It therefore failed

7    to give Parents adequate information to decide whether to accept the offer at all, and it necessarily

8    also failed to provide the required "blueprint for enforcement."

9            Tamalpais easily could have written a specific narrative in the IEP confirming that the

10   offer was for the pragmatic social skills group, explaining the details of the size and nature of that

11   group, and making clear that "the 45 minutes per week was a group with occasional individual

12   services as needed," AR 001058, as purportedly explained in the IEP meeting.  In the Court's

13   view, that description or something like it probably would have been sufficient to provide the

14   required notice and permit Parents to monitor implementation of the IEP (and to ensure that it

15   would be replicated in another school if D.W. changed school districts).  But Tamalpais instead

16   used a checkbox approach that was unclear on its face as to what services it was committing to

17   provide.  *See* AR 000365 (relevant portion of 2015 IEP).  The Court thus agrees with the ALJ that

18   Tamalpais's approach constituted a procedural violation of IDEA.

19           Moreover, the Court also agrees that this procedural violation deprived D.W. of a FAPE,

20   by failing to provide any standard against which Parents could measure and assure compliance

21   with particular contractual promises made by Tamalpais in the IEP.  As the Ninth Circuit

22   explained in *Antelope Valley*:

23                   [I]n enacting the IDEA, Congress was as concerned with parental
                     participation in the *enforcement* of the IEP as it was in its *formation*.
24                   Under the IDEA, parental participation doesn't end when the parent
                     signs the IEP.  Parents must be able to use the IEP to monitor and
25                   enforce the services that their child is to receive.  When a parent is
                     unaware of the services offered to the student—and, therefore, can't
26                   monitor how these services are provided—a FAPE has been denied,
                     whether or not the parent had ample opportunity to participate in the
27                   formulation of the IEP.

28   858 F.3d at 1198 (citations omitted) (emphasis in original).  That reasoning applies equally here.

                                                    15

Finally, Tamalpais argues that even if a procedural violation occurred that resulted in a denial of a FAPE, the ALJ erred in imposing the remedy of reimbursement of D.W.'s private school tuition and other expenses from the 2015-16 school year. Tamalpais's position relies heavily on its belief that the ALJ found "a minor procedural violation." Dkt. No. 44 at 20. But as the above discussion of *Antelope Valley* should make clear, Tamalpais's failure to provide sufficient notice and clarity in the IEP was consequential, and the ALJ correctly found that reimbursement is appropriate where a school district does not make a FAPE available to the student in a timely manner prior to the placement. *See* AR 000552 ¶ 6 (citing 20 U.S.C. § 1412(a)(10)(C)(ii); 34 C.F.R. § 300.148(c)). Whether or not the services were discussed at the IEP meeting, Tamalpais was required to commit in writing to a clear and enforceable plan. *See Antelope Valley*, 858 F.3d at 1199 ("[A] discussion does not amount to an offer. [Student] could force the District to provide only those services and devices listed in the IEP, not those discussed at the IEP meeting but left out of the IEP document."). As the ALJ found, Tamalpais's failure to do so warranted the reimbursement remedy imposed.

Accordingly, Tamalpais's cross-motion for summary judgment is **DENIED**.

## B. D.W.'s Motion for Summary Judgment

D.W. moves for summary judgment on three grounds. He argues that the ALJ (1) erred in not finding that Tamalpais was required to conduct a mental health assessment prior to the June 3, 2014 IEP offer;[5] (2) erred in finding that D.W. did not establish that he required classrooms with low student-teacher ratios; and (3) erred in denying his motion for additur to recover the cost of bridge tolls incurred during the 2015-16 school year while traveling to Stanbridge. Dkt. No. 43. D.W. contends that he is entitled to reimbursement of costs for the 2014-2015 school year based on the District's failure to conduct the mental health assessment. The Court disagrees as to each of these contentions as well, affirms the ALJ's findings and conclusions, and denies D.W.'s motion.

---

[5] As noted below, D.W. sometimes also frames the issue to include whether Tamalpais should have "offer[ed] counseling" in the 2014 IEP. *See* Dkt. No. 43 at 25.

     **i.   Even If Counsel Did Not Waive the Issue of Tamalpais's Failure to Provide a Mental Health Assessment in 2014-15, D.W. Has Already Received the Appropriate Remedy**

     a.  Administrative Proceedings

On April 16, 2016, counsel for D.W. filed a Request for Due Process Hearing. AR 000001-04. With respect to the IEP offered on June 3, 2014, the complaint raised three issues, including the following:

> THE DISTRICT DENIED FAPE BY NOT ADDRESSING [D.W.'s] SOCIAL-EMOTIONAL NEEDS
> The IEP offer also did not address [D.W.'s] social-emotional needs, specifically, anxiety, that interfered with [D.W.'s] ability to learn as a result of his deficits. The district did not offer to assess as to whether or not student required mental-health services in order to benefit from his education. The district's failure to identify this need and present goals and services to address it denied Student an offer of a FAPE.

AR 000003.

On June 2, 2016, D.W.'s counsel filed a Prehearing Conference Statement. AR 000026-29. Under the heading "ISSUES FOR HEARING," counsel listed two issues with regard to the IEP proposed by Tamalpais on June 3, 2014: "Whether or not the district denied Student a FAPE . . . by [f]ailing to offer a classroom with a low teacher-to-student ratio of not more than 1-teacher per 8-students [sic]; [and] failing to offer counseling services." AR 000027.[6] Unlike the Request for Due Process Hearing, the Prehearing Conference Statement did not frame the issue as the district's failure "to assess as to whether or not student required mental-health services." *See* AR 000027. The Prehearing Conference Statement also raised a number of issues with regard to the IEP offered by Tamalpais on May 21, 2015, including "[f]ailing to assess Student's mental-health needs," and, separately, "[f]ailing to offer counseling services." *Id.*

On June 6, 2016, the ALJ held a prehearing conference. AR 000558-82. At the hearing, with D.W.'s counsel's assent, the ALJ framed the issue for hearing as to the 2014 IEP as whether Tamalpais "den[ied] Student a FAPE during the 2014-2015 school year by failing to offer Student the following in his June 3, 2014 IEP: Subpart A, a classroom with a low teacher-to-student ratio

---

[6] While the Prehearing Conference Statement listed the date of the IEP as June 4, 2014, the parties confirmed during the hearing that June 3 was the correct date. AR 000568; AR 000570.

of not more than one teacher per eight students [and] Subpart B, counseling services." AR 000568-69. The ALJ asked whether counsel was withdrawing the other issues listed in the complaint for that year, and counsel responded that "[t]he social-emotional needs that weren't addressed is not withdrawn," and was "captured in failing to offer counseling services." AR 000569-70. Again, counsel did not specifically reference the mental health assessment issue. *Id.* Counsel withdrew one other issue. AR 000570 (withdrawing the sensory integration and occupational therapy claim pertaining to the 2015 IEP). As to the 2015 IEP, the ALJ, with counsel's assent, framed the failure to offer counseling services as one issue, and framed a "separate issue for the procedural violation of failing to assess in the areas of mental health and . . . sensory integration." AR 000573-75. The Order Following Prehearing Conference issued by the ALJ on June 8, 2016 tracked this agreed-upon framing of the issues. AR 000044-45.

In D.W.'s post-hearing brief, counsel muddled the issue further. On one hand, counsel argued that, as to both the 2014 and 2015 IEPs, "[t]he district had all information available to make an offer on an IEP that included counseling, but failed to." AR 000087. Counsel claimed that "[t]his is not a situation where the district was unaware of Student's needs for counseling, in fact, district personnel wrote it into both IEP offers that are in dispute in this case." *Id.* On the other hand, counsel later re-interjected a variant of the assessment issue as at least part of the supposed basis of the violation. AR 000088 ("THE DISTRICT SHOULD HAVE ASSESSED AND/OR OFFERED STUDENT DIRECT INSTRUCTION SERVICES OF COUNSELING"); *see also* AR 000090 ("[N]o action was taken with regard to assessing Student for DIS [Direct Instructional Services] counseling services or offering counseling services."); AR 000091 ("The district's procedural violation of failing to assess Student for counseling services impeded Student's right to an offer of a FAPE, deprived [D.W.] of educational benefits, and significantly impeded [Parents'] right to meaningfully participate in the IEP process."). In the post-hearing brief, counsel appears to have made these arguments with regard to both the 2014 and 2015 IEP offers, without discussing the specific circumstances surrounding each offer in any detail. *See* AR 000090 ("At both the June 3, 2014 IEP-Team meeting and the May 21, 2015 IEP-Team meeting, district personnel were well aware of Student's emotional dysregulation and the counseling that

18

was needed and incorporated into Stanbridge's program for [D.W.]").  The only specific evidentiary citation was to the 2015 meeting and IEP, or to information that did not exist at the time of the 2014 meeting and IEP, as follows:

> The district's offer for a comprehensive campus prompted Kenny Katz from Stanbridge Academy to state that Student would require counseling services if he were to transition to a comprehensive campus (See IEP dated May 21, 2015, page D-0150).  The district IEP note taker transcribed Mr. Katz's recommendation, onto the May 21, 2015, IEP document. . . . The notices of unilateral placement provided by [Parents] dated July 7, 2014 and December 10, 2014, stated that [Parents] believed that he required counseling services in order to benefit from his education.

*Id.*

Understandably, given this pervasive murkiness as to the precise issues D.W. was raising, the ALJ's decision was perhaps less clear than it could have been in its analysis of the assessment and counseling issues.  The administrative decision contains a subsection in the "Legal Conclusions" section entitled "June 3, 2014 IEP Offer."  AR 000543.  That section then includes a discussion of "Counseling as a Related Service."  AR 000544-45.  The first part of that discussion addresses D.W.'s argument that "he was denied a FAPE because the June 3, 2014 IEP did not offer counseling services."  AR 000544.  After a discussion of the evidence in the record, the ALJ found that "[b]ased on the information available to Tamalpais at the time of the June 3, 2014 IEP offer, Tamalpais did not deny Student a FAPE by failing to offer counseling as a related service."  *Id.*  This discussion tracked the issue as framed in the pre-hearing conference and order.  *See* AR 000558-82 (pre-hearing conference); AR 000043 (order).

In this same section on "Counseling as a Related Service," however, the ALJ continued under the heading "Assess in All Areas of Suspected Disability."  AR 000544.  In that section, rather than discussing the June 3, 2014 IEP offer, consistent with the overall heading of the section, the ALJ primarily discussed the *2015* offer and IEP.  *Id.* ("Student contends that he was denied a FAPE from May 21, 2015, through May 17, 2016, as a result of Tamalpais's failure to assess in the areas of mental health and sensory integration.").  These issues were raised in D.W.'s pre-hearing conference statement, AR 000026, and the pre-hearing order, AR 000044, as to 2015, but not as to 2014.  The ALJ noted that "[a]lthough Student's closing brief discusses a failure to

19

assess for DIS counseling services, this decision conforms to the issue as identified in the complaint and prehearing conference and determines whether Tamalpais failed to conduct a mental health assessment." AR 000544 ¶ 13. The ALJ went on to find that "[t]he evidence established that Student should have undergone a mental health assessment as of May 21, 2015, because Tamalpais was on notice that he displayed symptoms of anxiety and may have a mental health impairment." AR 000545 ¶ 16. The ALJ concluded that "Tamalpais's failure to assess Student's mental health denied Student a FAPE from May 21, 2015, though May 17, 2016." AR 000546 ¶ 20.

The ALJ then explained that "[t]his conclusion does not conflict with the earlier determination that Student did not establish a need for counseling as a related service." *Id.* ¶ 21. The ALJ found that "[t]he two conclusions are based on different legal standards, and while the evidence showed that mental health was an area of suspected disability, Student did not establish that he required counseling as a related service in his June 2014 IEP in order to receive educational benefit." *Id.*

Later in the administrative decision, the ALJ turned to the "May 21, 2015 IEP Offer." AR 000547. In the discussion under the heading "Counseling as a Related Service," the ALJ framed the issue as "Student contends that he was denied a FAPE because the May 21, 2015, IEP did not offer counseling services." AR 000548 ¶ 26. The ALJ found that "Student failed to establish that in May 2015 he required counseling as a related service in order to benefit from his education." *Id.* ¶ 27. The ALJ noted that "Student was not diagnosed with a mental health condition and had not previously received regular counseling or mental health treatment." *Id.* The ALJ explained that "[a]lthough Tamalpais had sufficient information to suspect that Student might have mental health needs, which warranted an assessment, Student did not establish that he had mental health needs that entitled him to services." *Id.* Accordingly, the ALJ found that "based on the information available to Tamalpais at the time of the May 2015 IEP offer, Tamalpais did not deny Student a FAPE by failing to offer counseling as a related service." *Id.*

As a remedy for the denial of FAPE between May 21, 2015 and May 17, 2016 resulting from Tamalpais's failure to perform a mental health assessment, the ALJ found that "Student is

20

entitled to an independent mental health evaluation at public expense."  AR 000551-52 ¶ 3-5.

      b. Proceedings in this Court

        1. Summary judgment briefing

    D.W.'s motion for summary judgment frames the issue being appealed this way: "D.W. REQUIRED A MENTAL-HEALTH ASSESSMENT PRIOR TO THE JUNE 3, 2014 IEP OFFER."  Dkt. No. 43 at 17.  But, as in the administrative proceeding, counsel repeatedly drifts between several different concepts in the brief, making it difficult to understand exactly *what* alleged error D.W. is appealing.  *Compare id.* at 17 (arguing that IEP team "should have assessed Student's needs prior to the meeting"); 18 (asserting that team "did not offer to assess DW in the area of Mental-Health or Direct Instruction Services (DIS) counseling and did not offer any DIS counseling services on DW's IEP"); 19 ("The district had available the information needed to conclude that DW required a Mental-Health Evaluation in order for the IEP team to consider whether or not counseling was required . . . ."); 20 ("Yet[] [Tamalpais] did not offer to provide a Mental-Health Evaluation, or even an IEP that included DIS related counseling services."); 21 ("The district was on notice that a mental-health evaluation was needed, but continued to neglect DW's special-education needs."); *id.* ("While not all procedural violations result in a denial of FAPE, the procedural violation of the district not offering to evaluate for mental-health services or assessing DW for DIS counseling services resulted in a substantive denial of a FAPE."); 22 ("At both the June 3, 2014[] IEP-Team meeting and the May 21, 2015[] IEP-Team meeting, district personnel were well aware of Student's emotional dysregulation and the counseling that was incorporated into Stanbridge's program for DW during the 2014-2015 school year and the 2015-2016 school year."); 23 (discussing "duty of the school district to assess [s]tudents based on the suspicion of a disabling condition"); *id.* ("[Tamalpais] was aware of DW's special-education needs in the area of mental-health and the counseling services that he was receiving during the school day.  The district had months to provide a Mental-Health Evaluation after the June 3, 2014 IEP meeting prior to the first day of the 2014-2015 school year, but chose not to."); *id.* (describing Tamalpais's "procedural violation of failing to assess Student for counseling services"); 25 ("Since the district did not offer counseling on DW's IEP, and did not offer to assess him in the

area of mental-health to determine his need for counseling, the June 3, 2014[] IEP denied him an offer of FAPE."); *id.* (making assertion, never raised before the ALJ, that 2014 IEP offer "denied Student an offer of a FAPE in that the offer was not clear and concise as required by prevailing case law").

## 2. Summary judgment hearing

At the hearing before this Court on the parties' cross-motions for summary judgment, counsel did nothing to dispel the confusion. Counsel first contended that "[t]he District did perform a social-emotional assessment by the school psychologist leading into the [2014] IEP offer," and asserted that the evaluation performed "doesn't rise to the level of a mental health evaluation, but it should have, in student's position, resulted in an offer of counseling." Dkt. No. 54 at 5 (hearing transcript). Counsel (eventually) acknowledged that her prehearing brief listed both "failure to offer counseling services" and "failure to assess mental health needs" as issues with the 2015 IEP, but omitted "failure to assess mental health needs" from the list of issues with the 2014 IEP. *Id.* at 6. Counsel explained that this was "[b]ecause leading up to the June 3, 2014 IEP, the school psychologist [did] a social-emotional assessment," which was not done in the lead-up to the 2015 IEP. *Id.* Counsel said that she left "failure to assess mental health needs" off of the list of 2014 issues "[b]ecause it would have appeared to be satisfied by the school psychologist's social-emotional assessment that she did conduct, and there is a report, and she reported on his social-emotional functioning. . . . so I was considering the mental health evaluation as the District social-emotional assessment . . . ." *Id.* at 7. Finally, counsel summed up by acknowledging that "[y]eah, I failed to identify the mental health evaluation in the issue for the prehearing conference because I considered the social-emotional assessment by the school psychologist as one level of a mental health evaluation." *Id.* at 8. Notwithstanding this discussion, counsel insisted that she did not waive this issue in the proceeding before the ALJ. *Id.* at 9.

At the hearing, counsel also tried to frame the issue, notwithstanding the all-caps heading quoted above from the summary judgment brief, as whether D.W. should have received a "mental

health assessment or counseling." Dkt. No. 54 at 3.[7]

### c. Analysis

The Court begins by pointing out what should be obvious from the lengthy discussion above: D.W.'s counsel's shape-shifting and lack of clarity as to the nature of the claim being asserted have resulted in a muddled record and needless expenditure of resources by this Court, the ALJ and the parties. Everyone involved benefits when all parties clearly and consistently articulate the issues being presented for resolution, and that did not happen here.

Tamalpais makes two primary arguments as to the 2014 mental health assessment issue. First, Tamalpais argues that "when D.W. filed his prehearing conference statement in advance of hearing, he included the issue of a DIS mental health assessment with regard only to the May 21, 2015 offer," and that "at the prehearing conference, D.W. agreed that his challenge regarding DIS mental health assessment was limited to the time period of May 21, 2015 to May 17, 2016." Dkt. No. 45 at 5. Tamalpais asserts that D.W. thus waived his argument as to the 2014 offer. *Id.* at 6. Second, Tamalpais contends that "even had D.W. properly raised and preserved an alleged failure to assess for DIS mental health services in advance of the June 2014 IEP, D.W. would not be entitled to the remedy of tuition reimbursement." *Id.* Tamalpais contends that even assuming a violation, the appropriate remedy would be the same as the one the ALJ already imposed for the failure to conduct an assessment in 2015: an order directing Tamalpais to fund an independent evaluation. *Id.*

As to the waiver argument, the Court's review of the record establishes that there is, at a minimum, a colorable argument that D.W. waived this issue below. This is not a circumstance where the primary problem was the ALJ's restatement of the issues pled in the complaint. *Cf. Antelope Valley*, 858 F.3d at 1196 n.2 (questioning the wisdom of procedure under which ALJ

---

[7] Reading between the lines, it appears that D.W.'s counsel is retroactively trying to frame the issues regarding the 2014 IEP offer to align with the issues regarding the 2015 IEP offer on which the ALJ found in D.W.'s favor. *See* Dkt. No. 54 at 7 (counsel's acknowledgment that change in position was "[b]ased on the testimony at the hearing"); Dkt. No. 43 at 3 ("One of the issues that rendered the [2015-16] IEP offer a denial of FAPE was the District's failure to offer a mental-health assessment prior to formulating a final offer on an IEP. That conclusion is correct, and should have been applied to the [2014-15] IEP offer as well . . . .").

1    restates and reorganizes issues in cases involving represented parties and intelligible complaints,

2    and holding that "[i]n such circumstances, failure to object [to restatement or reorganization] will

3    not be deemed a waiver of any claim fairly encompassed in the complaint"). Rather, D.W.'s

4    counsel's own framing of the issue presented was, at best, ambiguous and ever-changing, and the

5    record substantially supports the conclusion that counsel did not make clear at the administrative

6    hearing that it sought to pursue the 2014 assessment issue.

7         Regardless, even were the Court to find that D.W. did not waive this issue, and were to

8    assume the failure to conduct the mental health assessment was a procedural violation that resulted

9    in a denial of FAPE in 2014-2015 (just as the ALJ found it was in 2015-16), the Court agrees with

10   Tamalpais that D.W. has already received the appropriate remedy for that violation: an

11   assessment at Tamalpais's expense. In denying in part Tamalpais's motion to temporarily stay the

12   ALJ's order, the Court declined to stay enforcement of the required mental health assessment, and

13   understands that it has now been conducted. Dkt. No. 24 at 21-22 (order); Dkt. No 54 at 9 (at

14   summary judgment hearing, D.W.'s counsel did not dispute the Court's statement that the mental

15   health evaluation "has now been done"). The Court finds that the independent evaluation already

16   paid for by Tamalpais was an appropriate equitable remedy in light of the violation asserted. *See*

17   *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 374 (1985) (holding that the statutory

18   language of IDEA "means that equitable considerations are relevant in fashioning relief"); *Parents*

19   *of Student W. v. Puyallup Sch. Dist., No. 3*, 31 F.3d 1489, 1496 (9th Cir. 1993) (finding, in the

20   IDEA context, that "district court has the power to grant such relief as [it] determines is

21   appropriate"); *L.A. Unified Sch. Dist. v. D.L.*, 548 F. Supp. 2d 815, 822-23 (C.D. Cal. 2008)

22   (finding that school district had equitable obligation to fund independent educational evaluation).[8]

23        Furthermore, assuming *arguendo* that D.W. properly raised the issue as to whether his

24

25   _____

26   [8] In D.W's summary judgment motion, his counsel claims that "[d]ue to the lack of an offer of a
     Mental-Health Evaluation within the June 3, 2014[] IEP, Student's parents rejected the IEP offer,"
     and cites the July 7, 2014 notice of unilateral placement letter Parents sent to Tamalpais. Dkt. No.

27   43 at 12 (citing AR 000295). This representation is, at best, misleading: the letter does not
     mention, anywhere, the lack of an offer of a mental health evaluation as the basis for Parents'
     rejection of the offer. The fact that the letter mentions D.W.'s need for "on-site counseling" does

28   not support counsel's characterization, nor does any other evidence cited in the record.

2014-15 IEP denied him a FAPE because it failed to offer counseling as a related service—and recalling that the issue of whether Tamalpais denied D.W. a FAPE by failing to conduct a mental health assessment that same year is distinct, *see* AR 000546 ¶ 21—the Court affirms the ALJ's findings and conclusions. A FAPE includes "related services," 20 U.S.C. § 1401(9), which in turn include counseling services, *id.* § 1401(26). Thus, the question before the ALJ was whether Tamalpais denied D.W. a FAPE in 2014-15. Specifically, the issue is whether D.W.'s 2014-15 IEP, which did not include counseling as a related service, was "appropriately ambitious in light of his circumstances." *See Endrew F.*, 137 S. Ct. at 1001.

The ALJ determined that D.W. "did not establish that in June 2014 he required counseling as a related service in order to benefit from his education." AR 000544 ¶ 12. The Court accords that finding deference if the ALJ was "thorough and careful," *Antelope Valley*, 858 F.3d at 1194 (quoting *Union Sch. Dist.*, 15 F.3d at 1524), and if the record "supports the ALJ's opinion," *id.* at 1194 n.1. That standard is met here. As the ALJ noted, D.W. failed to prove—or indeed, offer any evidence—that he "needed a regularly occurring therapeutic counseling service in order to benefit from special education." AR 000544 ¶ 12; *see also* AR 000532-33 ¶ 16. D.W. offered evidence of, *inter alia*, an episode of hair-pulling, *see* AR 000263 (teacher's report that D.W. "developed the bad habit of pulling his hair out," resulting in "a circular bald spot that had a diameter of two inches"); the testimony of his father, who stated his belief that a "counselor at Stanbridge was necessary for D.W. to benefit at that school site," AR 000625; and the testimony of his seventh-grade teacher, who described D.W.'s defiance as a student and recalled that she "[o]ften . . . would have to clear the classroom," so counselors could come in to "support him and to try to get him back on track," AR 000775. The ALJ gave this evidence less weight compared to the testimony of Meredith Hanrahan, who assessed D.W. for his IEP in 2014 and who has a degree in school psychology and credentials in school psychology and special education. AR 000911. Ms. Hanrahan testified that, at the time of the assessment, she had received no information from D.W.'s private school that indicated he was undergoing counseling as a related service or that such counseling was necessary. AR 000936. Thus, the Court concludes, based on the record, that the individualized IEP without counseling as a related service satisfied the requirements of the IDEA

in light of D.W.'s circumstances. *See Endrew F.*, 137 S. Ct. at 1001.

### ii. The ALJ Correctly Found that D.W. Failed to Show That He Required a Classroom with a Low Student-Teacher Ratio

D.W. further argues that the ALJ erred in finding that he failed to show that he required a classroom with a low student-teacher ratio in connection with both the 2014 and 2015 IEPs. The Court disagrees. In determining whether a child's IEP provides a FAPE, courts "consider the IEP at the time of its implementation, not in hindsight . . . ." *JG*, 552 F.3d at 801. Because the ALJ heard substantial testimony on this issue, the Court accords the appropriate deference to the ALJ's findings, subject to the requirements of *Antelope Valley*.

With regard to the 2014-15 IEP, the ALJ found "no indications" from Tamalpais staff, Stanbridge staff, a neuropsychologist, or D.W.'s parents that D.W. "required a low teacher-to-student ratio." AR 000543 ¶ 8; *see also* AR 000263 (teacher testified that D.W. had five students in his math class and that "this has helped him to have teacher support," but not asserting that this was required for D.W. to succeed); AR 000264 (another teacher testified without mentioning class size or student-teacher ratio as an accommodation); AR 000234-35 (recommendations for classroom accommodations for D.W. pursuant to neuropsychological evaluation that did not include a lower student-teacher ratio); AR 000255 (recommendations for classroom accommodations by a speech-language pathologist that did not include a lower student-teacher ratio). The ALJ thus reasonably determined that, based on "what was known at the time the IEP offer was developed . . . there is no evidence establishing that at that time Tamalpais had any reason to believe that D.W. needed a particular teacher-to-student ratio." AR 000543 ¶ 8.

Similarly, with regard to the 2015-16 IEP, the ALJ again held that D.W. "did not meet his to burden to establish that, as of May 21, 2015, Tamalpais was on notice that Student needed a particular teacher-to-student ratio." AR 000547 ¶ 24. Nor did D.W. "establish that he required a classroom with a ratio of not more than one teacher per eight students to meet his unique needs." *Id.* ¶ 25. D.W. offered the testimony of Jay Huston, one of his former science teachers. *See* AR 000713. Huston opined that D.W., in order to be successful, required "vigilant monitoring from the teacher to help him sustain focus," which in turn required a student-teacher ratio akin to five

students for every teacher.  AR 000718-19.  D.W. also offered the testimony of Alison St. John, his former English teacher, who testified that D.W. required a student-teacher ratio of five students for every teacher because "[she] had to give so much attention to [D.W.] that it would be challenging if [she] had more students."  AR 000777.  While the ALJ found that Huston and St. John's testimony regarding D.W.'s needs was "consistent and credible," she reasonably concluded that D.W. had failed to proffer evidence showing "that such prompting and monitoring [could] only be accomplished with a teacher-to-student ratio of one to eight or fewer."  AR 000538 ¶ 39 (noting that D.W. failed to establish that his needs could not be met in a special day class, with the assistance of other classroom adults, or through existing IEP provisions for visual and verbal cues, breaks, and frequent check-ins).

Having determined that the ALJ's findings below were "thorough and careful," *Antelope Valley*, 858 F.3d at 1194 (quoting *Union Sch. Dist.*, 15 F.3d at 1524), and are supported by the record, *id.* at 1194 n.1, the Court affirms the ALJ's conclusion that D.W. failed to show that he required a low student-teacher ratio with regard to both the 2014-15 IEP and the 2015-16 IEP.

### iii.    The ALJ Correctly Denied D.W.'s Motion for Additur

It is undisputed that D.W.'s counsel failed to raise the issue of toll reimbursement before the ALJ until she filed her post-hearing brief.  AR 000097-98; *see also* AR 000554 ¶ 12 (explaining that request for reimbursement for bridge tolls "was made for the first time in Student's closing brief, and no evidence was presented regarding bridge tolls"); Dkt. 54 (transcript of March 30, 2017 hearing on cross-motions for summary judgment) at 11 (answering "I do not deny that" to Court's question, "Do you disagree that you did not present [the toll] issue to the ALJ until your post-hearing brief?").  The ALJ accordingly denied this late-raised request as unsupported by evidence.  AR 000554 ¶ 12.  It is also clear from the record that counsel also did not present any supporting evidence regarding the amount of tolls until she filed a motion for additur four days after the ALJ issued her final decision.  AR 000101-02 (motion); AR 000122 (amended order describing length of time between ALJ's final decision and counsel's motion).  The ALJ denied that motion, finding that it lacked jurisdiction following the issuance of the final decision.  AR 000122.

IDEA requires that certain "administrative appeal procedures . . . be pursued before seeking judicial review." *Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1302 (9th Cir. 1992) (citing 20 U.S.C. § 1415). This exhaustion requirement is not rigid, and "subject to certain exceptions." *Id.* at 1302-03. The Ninth Circuit has recognized three exceptions to IDEA's exhaustion requirement: where "(1) it would be futile to use the due process procedures; (2) an agency has adopted a policy or pursued a practice of general applicability that is contrary to the law; and (3) it is improbable that adequate relief can be obtained by pursuing administrative remedies . . . ." *Paul G. v. Monterey Peninsula Unified Sch. Dist.*, --- F. Supp. 3d ---, 2017 WL 2670739, at *7 (N.D. Cal. June 21, 2017) (quoting *Hoeft*, 967 F.2d at 1303-04) (internal punctuation omitted).

No such exception applies here. Counsel simply failed to raise and present evidence in support of her toll reimbursement claim before the ALJ at a time when Tamalpais could contest or otherwise respond to the evidence. The Court therefore denies the motion to reverse the ALJ's denial of D.W.'s request for toll reimbursement.

## IV.   CONCLUSION

For the foregoing reasons, the Court **DENIES** each party's cross-motion for summary judgment, and affirms the ALJ's decision in its entirety. The Clerk is directed to enter judgment consistent with this order and close the file.

**IT IS SO ORDERED.**

Dated:  9/21/2017

HAYWOOD S. GILLIAM, JR.
United States District Judge